**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **ROBERT NICHOLSON, JR.,** | : | **CIVIL ACTION NO. 1:18-CV-415** |
| | : | |
| **Plaintiff** | : | **(Chief Judge Conner)** |
| | : | |
| **v.** | : | |
| | : | |
| **PETCO ANIMAL SUPPLIES** | : | |
| **STORES, INC.,** | : | |
| | : | |
| **Defendant** | : | |

**MEMORANDUM**

Plaintiff Robert Nicholson, Jr. ("Nicholson") filed this age discrimination

lawsuit against his employer, defendant Petco Animal Supplies Stores, Inc.

("Petco"). Nicholson alleges discrimination and retaliation in violation of the Age

Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.* Petco moves

for summary judgment on both claims. (Doc. 22).

## I. Factual Background and Procedural History[1]

Petco is a "leading specialty retailer of premium pet food, supplies, and

services," operating over 1,500 stores in the United States and Puerto Rico. (Doc. 24

_____

[1] Local Rule 56.1 requires that a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56 be supported "by a separate, short, and concise statement of the material facts, in numbered paragraphs, as to which the moving party contends there is no genuine issue to be tried." LOCAL RULE OF COURT 56.1. A party opposing a motion for summary judgment must file a separate statement of material facts, responding to the numbered paragraphs set forth in the moving party's statement and identifying genuine issues to be tried. Id. Unless otherwise noted, the factual background herein derives from the parties' Rule 56.1 statements of material facts. (See Docs. 24, 28). To the extent the parties' statements are undisputed or supported by uncontroverted record evidence, the court cites directly to the Rule 56.1 statements.

¶ 1). Nicholson has been employed by Petco since April 2006. (Id. ¶¶ 8, 11). He currently is a "Store Leader," supervising one of Petco's stores in Harrisburg, Pennsylvania, a position he has held since October 17, 2016. (Id. ¶¶ 11-12). Before that time, Nicholson was a "District Leader," overseeing and managing 12 to 25 Petco stores in Maryland and Pennsylvania. (Id. ¶¶ 8-9, 11-14). The parties agree that Store Leader is a "lower" position than District Leader. (Id. ¶ 11; Doc. 28 ¶ 11). The facts surrounding Nicholson's change in position at Petco are as follows.

In January 2016, Alan McVey ("McVey"), who is approximately 12 years Nicholson's junior, was promoted to Vice President of Regional Operations ("VPRO"). (Doc. 24 ¶¶ 26-27). This promotion was part of Petco's "company-wide organizational and operational" restructuring, which included, *inter alia*, new executive leadership and elevated standards and expectations for store management. (Id. ¶¶ 24-26). As VPRO, McVey oversaw 18 District Leaders and approximately 400 Petco locations on the East Coast. (Id. ¶¶ 28-29). McVey was expected to spend at least 50 percent of his time making announced and unannounced visits at stores in his region. (Id. ¶ 31). Before becoming VPRO (and concomitantly Nicholson's immediate supervisor), McVey had spoken with Nicholson about the heightened performance expectations for Petco stores and employees, including District Leaders. (Id. ¶¶ 34-35).

Nicholson alleges that, in 2016, McVey made a series of discriminatory comments regarding Nicholson's age. According to Nicholson, McVey (1) repeatedly referred to him as the "senior" or "elder" District Leader during regional conference calls with other District Leaders and Petco management;

(2) referred to him as an "elder statesman" during one regional conference call; (3) asked Nicholson if he had taken "a nap" or "fall[en] asleep" due to Nicholson inadvertently muting his phone during a conference call; and (4) questioned if Nicholson was really "up for that kind of thing" after Nicholson expressed interest in a regional position.  (Id. ¶ 37; Doc. 36-1, Nicholson Dep. 76:17-86:19[2]).

Nicholson highlights one specific incident that he claims occurred on July 12, 2016.  On that date, McVey visited a store in Nicholson's district where he met with Nicholson and six or seven of the district's Store Leaders.  (Doc. 24 ¶¶ 44-45; Doc. 28 ¶ 46).  Nicholson alleges that, in front of him and the Store Leaders, McVey made the following "joke": McVey called out to the store's dog trainer and said, "I have . . . a dog training question."  The dog trainer responded, "Okay.  What's up," and McVey replied, "I have this really old dog, and I can't teach him any new tricks."  The dog trainer said, "Okay," and McVey continued, "Yeah.  His name is Bob."  (Doc. 24 ¶ 46; Doc. 28 ¶ 46; Nicholson Dep. 196:14-23; Doc. 36-3, Barnett Dep. 14:9-16, 89:4-9).  Nicholson avers that the Store Leaders remained silent after this exchange and then "walked away" in discomfort.  (Nicholson Dep. 196:23-197:4).  McVey testified that he does not "recall" making the alleged joke or any other age-related comments.  (Doc. 36-2, McVey Dep. 34:7-21, 89:4-13).

Nicholson contacted his Human Resources Business Partner, Wayne Barnett ("Barnett"), about the alleged "old dog" comment shortly after the incident.  (Doc.

---

[2] Deposition transcripts or portions thereof have been filed by the parties at separate docket entries.  We will cite to the full deposition transcripts only, using the convention "[Name] Dep.," without repeating the docket entry citation *passim*.

24 ¶ 50). Nicholson told Barnett that McVey's comment made him uncomfortable, but asked Barnett not to tell McVey about this complaint. (Id. ¶ 52). On July 18, 2016, Barnett—who felt compelled by his job responsibilities to communicate the complaint—spoke with McVey via telephone about Nicholson's concerns. (Id. ¶ 54; Barnett Dep. 18:16-22, 19:8-23; Nicholson Dep. 211:22-212:9). According to Barnett, McVey responded that "it was possible that he [McVey] had made commentary that he felt was lighthearted, that may have been . . . similar to the verbiage that [Nicholson] had stated to [Barnett], but [McVey] didn't recall the exact verbiage, and he didn't recall the context." (Barnett Dep. 20:4-9).[3] Barnett counseled McVey that if the comment had been made, "it was certainly ill-advised" or "inappropriate" and that McVey "should refrain going forward from any kind of commentary like that again." (Doc. 24 ¶ 56). Barnett then called Nicholson and informed him that he had spoken to McVey about the incident. (Id. ¶ 57). Nicholson attests that, during this phone call, Barnett told Nicholson that McVey had admitted making the "old dog" comment and felt badly about it. (Nicholson Dep. 212:15-213:6).

Nicholson claims that after Barnett spoke with McVey regarding the "old dog" comment, McVey began to treat Nicholson differently. (Doc. 24 ¶ 61). Nicholson avers that McVey would "dodge" his phone calls and ignore his emails, that McVey became "dismissive," and that their relationship generally turned "icy."

---

[3] This portion of Barnett's deposition testimony differs from his declaration, wherein Barnett avers that on the July 18, 2016 phone call, McVey "did not recall making the joke[.]" (Doc. 25-1 ¶ 18). However, we view the facts in a light most favorable to Nicholson, the nonmovant, at the Rule 56 stage. See Section II, *infra*.

(Id.)  Nicholson also contends that McVey performed retaliatory, unannounced store visits in Nicholson's district, targeting stores that Nicholson had previously identified as "problem" locations.  (Id.)

In early September 2016, Regional Pet Services Director Ronee Wyatt ("Wyatt") made several unannounced visits to stores in Nicholson's district to evaluate each location's pet services.  (Id. ¶¶ 63-64).  Wyatt and Nicholson had previously agreed that such visits should be unannounced so that Wyatt could properly assess the stores.  (Id. ¶ 64).  Wyatt reported to McVey that some of the stores were in "rough" or "very, very rough" condition, that one of the new stores might not be prepared for its opening day, and that Nicholson had demonstrated a lack of concern about the new store potentially being unprepared for opening.  (Id. ¶ 66).

McVey performed unannounced visits on approximately eight stores in Nicholson's district later that month.  (Id. ¶¶ 69, 71).  Of those eight stores, four or five needed significant improvement in areas such as "cleanliness, brand standards, inventory, merchandising, animal care, and guest engagement."  (Id. ¶ 71).  During a follow-up conference call between McVey, Nicholson, and Barnett on October 4, 2016, McVey identified four stores that needed immediate attention.  (Id. ¶ 75).  Nicholson agreed that some of the stores had opportunities for improvement but disagreed as to the extent of the deficiencies.  (Id. ¶ 76; Nicholson Dep. 291:3-24, 294:10-25, 295:15-296:5).  At the end of the call, McVey asked Nicholson to create an "action plan" detailing how Nicholson would bring the four underperforming stores "up to standard."  (Doc. 24 ¶ 79; Nicholson Dep. 261:16-23).

Before this October 4 conference call, Nicholson had contacted Petco's Senior Employee Relations Specialist, Kristine Kaswell ("Kaswell"), after he learned of McVey's unannounced store visits. (Doc. 24 ¶ 112). Nicholson discussed a host of issues with Kaswell, including the July 12 "old dog" comment, Nicholson's complaint to Barnett about this incident, Barnett's communication of the complaint to McVey, and McVey's unannounced store visits. (Id. ¶ 113; Nicholson Dep. 225:1-9). He also informed Kaswell that his relationship with McVey had turned "icy" after the complaint; that McVey was failing to respond promptly to his calls and emails; that McVey did not like him and was "coming after" him, causing Nicholson to "fear for [his] job"; and that Nicholson did not feel he was "part of [Petco's] new regime." (Doc. 24 ¶ 113; Nicholson Dep. 225:9-11). Kaswell told Nicholson that this "was not typically how these things would have been handled," but because no disciplinary or other adverse action had yet been taken, there was "nothing for her to do." (Doc. 24 ¶ 114; Nicholson Dep. 225:13-22). She told Nicholson that he should contact her if he did receive formal discipline and she would begin an investigation. (Doc. 24 ¶ 114).

On October 7, 2016, Nicholson emailed McVey the requested "action plan," which provided a specific course of conduct for the first 30 days of a longer, 90-day plan. (Doc. 24 ¶¶ 82-83; Doc. 25-2 at 193-96). Nicholson also included his notes from his prior visits to the problem stores, as requested by McVey. (Doc. 24 ¶¶ 79, 82). On another conference call three days later, McVey accepted Nicholson's action plan but issued him a formal warning. (Id. ¶¶ 86-88). McVey testified that he felt a written warning was necessary due to Nicholson's lack of "urgency" to correct the

identified problems and his failure to appropriately take ownership of the underperforming stores in his district. (Id. ¶ 85; McVey Dep. 73:7-75:11). McVey initially delivered the written warning by reading it over the phone to Nicholson. (Doc. 24 ¶ 89). The warning recited the issues that McVey felt needed to be resolved in the identified stores, and Nicholson largely agreed with McVey's assessment. (Id. ¶¶ 90-93, 95; Doc. 25-2 at 198-99).

McVey also suggested on this October 10 call that Nicholson could step down to a role as Store Leader at one of Petco's locations as an alternative to moving forward with the action plan and meeting its requirements. (Doc. 24 ¶¶ 97, 100). The change in position would result in, among other things, an eight percent salary reduction. (Id. ¶ 100). The parties dispute the nature of this offer and Nicholson's eventual acceptance. Petco contends that Nicholson freely and voluntarily chose to move into the Store Leader position, (see Doc. 24 ¶¶ 103, 105); Nicholson asserts that, through subsequent "thinly veiled" threats from McVey, the "offer" became an ultimatum: step down to Store Leader or be fired from the position of District Leader, (Doc. 28 ¶¶ 103, 105, 108).

Nicholson attempted to contact Kaswell on two separate occasions immediately following the October 10 conference call and warning issuance. (Doc. 24 ¶ 122). Nicholson called Kaswell that day, and again on either October 11 or 12. (Nicholson Dep. 309:3-15, 311:15-21). He left voicemails both times, indicating that he had received a written warning from McVey and that he wanted to talk to Kaswell about it, and also referencing the issue of him "stepping down" to the Store

Leader position. (Doc. 24 ¶¶ 123-24). Kaswell did not return Nicholson's phone calls. (Nicholson Dep. 312:17-18).

On October 11, McVey provided Nicholson more details about the step-down offer, explaining that the position would be Store Leader of Harrisburg store number 1887 and would offer a salary of approximately $110,000, which was $8,000 less than Nicholson's District Leader salary. (Doc. 24 ¶¶ 100, 102; Nicholson Dep. 305:7-14). Nicholson asked McVey for some time to consider the decision and was given until Tuesday, October 17. (Doc. 24 ¶ 104; Nicholson Dep. 301:13-19, 305:16-25). McVey then called Nicholson back and informed him that Petco needed an answer by Monday, October 16. (Nicholson Dep. 301:20-23, 306:1-8). Nicholson verbally accepted the Store Leader position, which he subsequently confirmed in writing on October 17, 2016. (Doc. 24 ¶ 106; Doc. 25-2 at 200).

Several months later, Nicholson filed a charge of age discrimination with the Equal Employment Opportunity Commission ("EEOC"), and the EEOC issued a right to sue letter in December 2017. (Doc. 24 ¶¶ 125, 134; Doc. 25-6). Nicholson timely filed the instant lawsuit, asserting discrimination (Count 1) and retaliation (Count 2) under the ADEA. Petco moves for summary judgment on both claims. The motion is fully briefed and ripe for disposition.

## II. <u>Legal Standard</u>

Through summary adjudication, the court may dispose of those claims that do not present a "genuine dispute as to any material fact" and for which a jury trial would be an empty and unnecessary formality. FED. R. CIV. P. 56(a). The burden of proof tasks the non-moving party to come forward with "affirmative

evidence, beyond the allegations of the pleadings," in support of its right to relief.

Pappas v. City of Lebanon, 331 F. Supp. 2d 311, 315 (M.D. Pa. 2004); see also Celotex

Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  The court is to view the evidence "in

the light most favorable to the non-moving party and draw all reasonable inferences

in that party's favor."  Thomas v. Cumberland County, 749 F.3d 217, 222 (3d Cir.

2014).  This evidence must be adequate, as a matter of law, to sustain a judgment in

favor of the non-moving party on the claims.  Anderson v. Liberty Lobby, Inc., 477

U.S. 242, 250-57 (1986); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S.

574, 587-89 (1986).  Only if this threshold is met may the cause of action proceed.

See Pappas, 331 F. Supp. 2d at 315.

**III.**   **Discussion**

The ADEA makes it unlawful for an employer to "discriminate against any

individual with respect to his compensation, terms, conditions, or privileges of

employment, because of such individual's age[.]"  29 U.S.C. § 623(a)(1).  The ADEA

also explicitly prohibits retaliation against an employee who opposes, complains

about, or aids in the investigation of a claim of age discrimination.  Id. § 623(d).

Nicholson alleges that Petco both discriminated and retaliated against him.  We

examine each claim in turn.

**A.**    **Age Discrimination**

Nicholson has not adduced direct evidence of discrimination.  Age

discrimination claims based on circumstantial evidence follow the familiar

McDonnell Douglas three-step burden-shifting framework.  Willis v. UPMC

Children's Hosp. of Pittsburgh, 808 F.3d 638, 644 (3d Cir. 2015); see generally

9

McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). To establish a *prima facie* case of age discrimination, a plaintiff must prove: (1) he is a member of the protected class, *i.e.*, he is at least 40 years old; (2) he is qualified for the position in question; (3) he suffered an adverse employment action; and (4) the circumstances surrounding the adverse action "could give rise to an inference of intentional discrimination." Burton v. Teleflex Inc., 707 F.3d 417, 426 (3d Cir. 2013) (quoting Makky v. Chertoff, 541 F.3d 205, 214 (3d Cir. 2008)). The burden of establishing a *prima facie* case "is not onerous," Doe v. C.A.R.S. Prot. Plus, Inc., 527 F.3d 358, 365 (3d Cir. 2008) (quoting Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981)), and presents a "low bar" for employment discrimination plaintiffs, Scheidemantle v. Slippery Rock Univ. State Sys. of Higher Educ., 470 F.3d 535, 539 (3d Cir. 2006) (citation omitted).

If a plaintiff can demonstrate a *prima facie* case of age discrimination, the burden then shifts to the employer to offer a "legitimate nondiscriminatory reason" for the adverse employment action. Willis, 808 F.3d at 644 (citation omitted); McDonnell Douglas Corp., 411 U.S. at 802. After the defendant has come forth with such evidence, the burden rebounds to the plaintiff to show that the proffered reason is pretext. Willis, 808 F.3d at 644 (citing Burton, 707 F.3d at 426-27). To ultimately prevail on an age discrimination claim, the plaintiff "must establish, by a preponderance of the evidence, that age was the 'but-for' cause of the adverse employment action." Id. (citing Gross v. FBL Fin. Servs., Inc., 557 U.S. 167, 177-78 (2009)).

### 1. Prima Facie *Case*

Petco first argues that summary judgment must be granted in its favor because Nicholson has not established an adverse employment action or an inference of discrimination for his *prima facie* case of age discrimination. We disagree.

### a. <u>Adverse Employment Action</u>

An "adverse employment action" is one that is "serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment." <u>Jones v. SEPTA</u>, 796 F.3d 323, 327 (3d Cir. 2015) (discussing adverse employment action under Title VII) (quoting <u>Storey v. Burns Int'l Sec. Servs.</u>, 390 F.3d 760, 764 (3d Cir. 2004)). Courts have held, in the Title VII context, that actionable adverse decisions include denial of a raise or promotion, failure to rehire, discharge, demotion, suspension without pay, and transfer with detrimental collateral consequences. <u>See</u> <u>Burlington Indus., Inc. v. Ellerth</u>, 524 U.S. 742, 761 (1998) (discussing "tangible employment action" affecting employment terms or conditions for hostile work environment claim); <u>Connelly v. Lane Constr. Corp.</u>, 809 F.3d 780, 791-92 (3d Cir. 2016); <u>Jones v. Sch. Dist. of Phila.</u>, 198 F.3d 403, 411-12 (3d Cir. 1999). We see no reason to delineate between Title VII and the ADEA as to the contours of an adverse employment action. The relevant portions of both statutes are identical and protect against invidious discrimination "with respect to [an employee's] compensation, terms, conditions, or privileges of employment." <u>See</u> 29 U.S.C. § 623(a)(1); 42 U.S.C. § 2000e-2(a)(1). The Third Circuit Court of Appeals,

moreover, has explained that its definition of adverse employment action under Title VII "stems from the language of Title VII itself." Storey, 390 F.3d at 764.

Petco argues that neither the written warning nor the change in position from District Leader to Store Leader qualifies as an adverse employment action. Nicholson appears to concede that the written warning is not an adverse action. (See Doc. 27 at 6-8.) We agree, primarily because the warning was not accompanied by any materially adverse effect on Nicholson's compensation, terms, conditions, or privileges of employment. See Reynolds v. Dep't of Army, 439 F. App'x 150, 153-54 (3d Cir. 2011) (nonprecedential); Cole v. Illinois, 562 F.3d 812, 816-17 (7th Cir. 2009); Givens v. Cingular Wireless, 396 F.3d 998, 998 (8th Cir. 2005).

Nevertheless, we find that Nicholson has identified and supported a *prima facie* adverse employment action in the form of constructive demotion. The Third Circuit has not explicitly held that "constructive demotion" is a viable adverse employment action. But other circuits have. See Fenney v. Dakota, Minn. & E. R.R. Co., 327 F.3d 707, 717-18 (8th Cir. 2003); Simpson v. Borg-Warner Auto. Inc., 196 F.3d 873, 876 (7th Cir. 1999); Sharp v. City of Houston, 164 F.3d 923, 933-34 (5th Cir. 1999). And the Third Circuit has intimated that constructive demotion could be cognizable in the employment discrimination context. See Clark v. Township of Falls, 890 F.2d 611, 618-19 (3d Cir. 1989). We find the reasoning of Fenney, Simpson, and Sharp sound. Constructive demotion is no less adverse than actual demotion, and employers should not be permitted to create conditions that force an employee to accept a lower position when they are barred from creating conditions that cause an employee to involuntarily "resign"—*i.e.*, constructive discharge.

Nicholson maintains that his move from District Leader to Store Leader was an involuntary demotion. He claims that McVey—like Don Vito Corleone, Marlon Brando's iconic character in *The Godfather*—forced the step down by making Nicholson "an offer he c[ould]n't refuse." Nicholson, in fact, used this language to describe the demotion in an email he sent to a coworker. (See Nicholson Dep. 318:8-22; Doc. 25-2 at 201).

Nicholson testified that when McVey called him back to request an earlier decision and Nicholson again hesitated, McVey stated, "Listen, you know, before you say no, just understand that people could be coming to visit your district within a very short period of time, and those visits might not go well, so, you know, you just don't know what your position is going to be if you refused." (Nicholson Dep. 301:22-302:4). When Nicholson directly questioned McVey if store visits were imminent, McVey purportedly responded, "Well, all I'm telling you is that—I'm not telling you somebody is coming or somebody isn't coming. I'm telling you that somebody could show up, could visit those stores. It could go bad, and who knows what your position will be following that." (Id. at 302:5-13). Nicholson interpreted these statements as "thinly veiled threats" that, if he did not accept the "one-time" step-down offer, he would be fired from his District Leader position. (Id. at 302:13-15, 304:14-24, 318:19-22, 319:13-17). After calling Kaswell twice about the situation, leaving two voicemails, and receiving no response, Nicholson claims he accepted the Store Leader position because "working [as Store Leader] was better than being unemployed." (Id. at 319:13-17).

We find that Nicholson has adduced evidence tending to show that his change in position was not "truly voluntary."  See Fenney, 327 F.3d at 717.  Viewing the facts in a light most favorable to Nicholson, a reasonable juror could infer from McVey's alleged threats, Kaswell's silence, and other circumstances that Nicholson's only options were demotion or unemployment.  Petco's arguments to the contrary are unavailing.  Petco points to evidence demonstrating that (1) Nicholson was experiencing high levels of stress and anxiety in the District Leader position; (2) he believed a Store Leader position would be less stressful; (3) the step down involved only a small reduction in salary; and (4) Nicholson expressed interest in, and negotiated some of the terms of, the position change.  (See Doc. 23 at 8-9).  This evidence, rather than completely undermining Nicholson's claim, demonstrates a genuine dispute of material fact regarding the voluntariness of the step-down decision.

### b.    Inference of Discrimination

We also disagree with Petco that Nicholson has not established the fourth element of a *prima facie* case: circumstances that raise an inference of age-based discrimination.  To satisfy this element, a plaintiff must demonstrate "some causal nexus between his membership in a protected class" and the adverse employment action.  Sarullo v. U.S. Postal Serv., 352 F.3d 789, 798 (3d Cir. 2003).  Ageist comments made by a decisionmaker, especially when directed at the plaintiff, can raise an inference of discriminatory animus.  See Willis, 808 F.3d at 646; Keller v. Orix Credit All., Inc., 130 F.3d 1101, 1111-12 (3d Cir. 1997); Ryder v. Westinghouse

Elec. Corp., 128 F.3d 128, 133 (3d Cir. 1997); Abrams v. Lightolier Inc., 50 F.3d 1204, 1215 (3d Cir. 1995).

In the case *sub judice*, we need look no further than McVey's purported comments. As detailed above, McVey allegedly made ageist remarks directed at Nicholson in front other Petco employees in the months leading up to the change in position. Petco assumes—for purposes of summary judgment—that these comments were made. A reasonable juror could easily infer intentional discrimination from McVey's overt, age-based commentary. See Keller, 130 F.3d at 1112.

We reject Petco's contention that McVey's comments were "stray remarks" unrelated to the decisionmaking process and thus cannot support an inference of discrimination.[4] On the contrary, "discriminatory comments by an executive connected with the decisionmaking process will often be the plaintiff's strongest circumstantial evidence of discrimination[.]" Abrams, 50 F.3d at 1215. We likewise reject Petco's assertion that the "senior" and "elder" comments are age-neutral. McVey used those terms to refer to Nicholson even though Nicholson was not the

---

[4] The cases on which Petco relies for this proposition all involve the final step in the McDonnell Douglas burden-shifting paradigm—establishing pretext—not the *prima facie* showing. See Keller, 130 F.3d at 1112 (noting that employer's ageist comments "certainly constitute evidence from which a reasonable factfinder" could infer age-based discrimination, but were insufficient alone to prove, by a preponderance of evidence, that age was determinative cause of adverse action); Connolly v. Pepsi Bottling Grp., LLC, 347 F. App'x 757, 758-61 (3d Cir. 2009) (nonprecedential); Parker v. Verizon Pa., Inc., 309 F. App'x 551, 555-59 (3d Cir. 2009) (nonprecedential); Shade v. Alfa Laval Inc., No. 1:14-CV-813, 2017 WL 839456, at *12-13 (M.D. Pa. Mar. 3, 2017). The discussions in these cases about the probative value of certain stray remarks, therefore, are inapposite to the case at bar.

most experienced or tenured District Leader on the regional conference calls. (See Nicholson Dep. 78:22-79:16, 82:8-17). We therefore conclude that Nicholson has established a *prima facie* case of age discrimination.

### 2. *Pretext*

Petco has satisfied its "relatively light burden" of providing a legitimate, nondiscriminatory reason for its actions. See Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir. 1994). McVey avers that he offered Nicholson the step-down option because he respected Nicholson's tenure with the company but was concerned that Nicholson may be unwilling or unable to keep pace with Petco's "new operational expectations and accountability." (See Doc. 24 ¶¶ 23-26, 34-35, 97-98; McVey Dep. 93:8-25). McVey asserts that he based these concerns primarily on Nicholson's "demeanor" in response to the unannounced store visits. (McVey Dep. 93:8-25).

The burden therefore rebounds to Nicholson to offer evidence sufficient for a reasonable factfinder to infer "that [Petco]'s proffered justification is merely a pretext for discrimination." See Burton, 707 F.3d at 426 (citation omitted). A plaintiff can show pretext by pointing to direct or circumstantial evidence from which a reasonable factfinder could either (1) disbelieve the employer's proffered justification or (2) "believe that an invidious discriminatory reason was more likely than not" the "determinative cause of the employer's action." Id. at 427 (quoting Fuentes, 32 F.3d at 764). Under the first prong, a plaintiff can discredit an employer's explanation by showing "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in the proffered legitimate reason. Id. Under the second prong, a plaintiff may satisfy his burden by offering sufficiently probative

evidence that the employer previously discriminated against the plaintiff or others within the plaintiff's protected class or within another protected class, or treated similarly situated persons outside the plaintiff's protected class more favorably. Simpson v. Kay Jewelers, Div. of Sterling, Inc., 142 F.3d 639, 645 (3d Cir. 1998) (citing Fuentes, 32 F.3d at 765).

Nicholson relies on the first prong to show pretext, marshalling the following evidence. First, he contends that some of McVey's reasons for the written warning, which precipitated the demotion, are false or exaggerated. Nicholson attested that although McVey claimed that he was not properly greeted or approached in any of the eight stores he visited, video and other evidence from three of McVey's visits shows that store employees either spoke with McVey or attempted to do so. (Nicholson Dep. 293:13-294:25).

More saliently, Nicholson points to the inconsistency in McVey's outward "acceptance" of the 30-day action plan and his private ultimatum, issued a day later, to take the demotion or face termination. In his deposition, McVey attested that after he delivered the written warning, Nicholson had a positive demeanor and "said he would get it done," that McVey "felt comfortable [Nicholson] understood the expectation and was going to go ahead and close those gaps" identified in the warning, and that McVey "felt confident that [Nicholson] was going after it." (McVey Dep. 79:2-3, 18-23, 80:1-3, 81:17-23). Barnett similarly testified that McVey "had every expectation that [Nicholson] could . . . achieve what was written in th[e] warning." (Barnett Dep. 32:9-13). Nicholson posits that if McVey believed that

Nicholson could and would execute the action plan and bring the stores in his district up to standard, there was no legitimate reason to force a demotion.

Petco maintains that there is no inconsistency or contradiction because Nicholson's opportunity to implement the 30-day action plan was obviated by his voluntary acceptance of the step-down offer. In Petco's view, McVey fully believed that Nicholson could successfully implement the action plan, but also felt that Nicholson might not be willing to "close those operational gaps and keep pace with Petco" and instead would want to move to Store Leader and "protect his pay as close to what it was." (McVey Dep: 93:20-23). Petco asserts that Nicholson simply chose the less demanding Store Manager option.

Petco's argument, however, presupposes belief in its version of the facts, *viz.*, that Nicholson's move to Store Leader was entirely voluntary. As discussed *supra*, Nicholson has adduced evidence that he was constructively demoted. Because Nicholson is the nonmovant, we must view the facts in a light most favorable to him. Thomas, 749 F.3d at 222. Through this Rule 56 lens, we find that Nicholson has sufficiently put forward inconsistencies or contradictions in Petco's legitimate reason such that "a reasonable factfinder *could* rationally find [it] unworthy of credence." Kautz v. Met-Pro Corp., 412 F.3d 463, 467 (3d Cir. 2005) (quoting Fuentes, 32 F.3d at 765). Specifically, if jurors believe the demotion was involuntary, they could logically *disbelieve* McVey's proffered explanation—that he was confident that Nicholson could implement the action plan and comply with Petco's heightened standards but that Nicholson may be "unwilling" to do so and thus opt for the Store Leader position. After all, if McVey had "every expectation"

that Nicholson could execute the action plan, which was explicitly crafted to address McVey's concerns regarding Nicholson's performance, there would be no need to force Nicholson out of his long-held District Leader position. This disbelief, coupled with Nicholson's *prima facie* evidence of age discrimination, would permit a reasonable factfinder to conclude that McVey's actions were instead driven by discriminatory animus. See Burton, 707 F.3d at 427; Fasold v. Justice, 409 F.3d 178, 185 (3d Cir. 2005); Fuentes, 32 F.3d at 764 (citing St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 511 (1993)). We will therefore deny Petco's motion for summary judgment as to Nicholson's claim of age discrimination.

### B. Retaliation

A *prima facie* case of retaliation under the ADEA requires a plaintiff to show that (1) he engaged in a "protected employee activity"; (2) he suffered an adverse employment action either contemporaneous with or following the protected activity; and (3) a causal link exists between the protected activity and the adverse action. E.E.O.C. v. Allstate Ins. Co., 778 F.3d 444, 449 (3d Cir. 2015). The third element has also been described as requiring the plaintiff to provide evidence "sufficient to raise the inference" that the protected activity was the "*likely reason*" for the adverse action. Carvalho-Grevious v. Del. State Univ., 851 F.3d 249, 259 (3d Cir. 2017) (quoting Kachmar v. SunGard Data Sys., Inc., 109 F.3d 173, 177 (3d Cir. 1997)). Petco challenges the second and third elements. Because we have little difficulty finding that McVey's purported demotion of Nicholson qualifies as an

"adverse employment action" for a retaliation claim,[5] we need only address causation.

Whether there is a causal nexus between the protected activity and the adverse action is a totality-of-the-circumstances inquiry. Daniels, 776 F.3d at 196. A plaintiff asserting retaliation may rely solely on temporal proximity between the protected conduct and the adverse action to create an inference of causation, but only if the timing is "unusually suggestive" of a retaliatory motive. Id. (quoting Leboon v. Lancaster Jewish Cmty. Ctr. Ass'n, 503 F.3d 217, 232 (3d Cir. 2007)). Absent such suggestive timing, courts consider "any intervening antagonism by the employer, inconsistencies in the reasons the employer gives for its adverse action, and any other evidence suggesting" a retaliatory animus. Id. (citations omitted).

Nicholson has proffered sufficient evidence to carry his *prima facie* burden of demonstrating causation. First, Nicholson points to Barnett's reporting of Nicholson's complaint about the "old dog" comment to McVey on July 10, 2016, and McVey's constructive demotion of Nicholson approximately three months later. A three-month gap between protected activity and an adverse action, without more, is not "unusually suggestive" so as to defeat summary judgment. See Leboon, 503

---

[5] An adverse action for the second prong of a *prima facie* retaliation claim is one that a reasonable employee would find "materially adverse"; *i.e.*, the action "might well [dissuade] a reasonable worker from making or supporting a charge of discrimination." Daniels v. Sch. Dist. of Phila., 776 F.3d 181, 195 (3d Cir. 2015) (alteration in original) (citation omitted). A demotion clearly fits within these parameters.

F.3d at 233.[6]  But Nicholson provides other evidence of retaliatory animus.  He testified that, after the complaint was reported to McVey, McVey's treatment of him changed.  Nicholson avers that McVey became dismissive and ignored or delayed responding to Nicholson's calls and emails, and that their relationship generally turned "icy."  According to Nicholson, McVey also intentionally selected troubled stores in Nicholson's district to visit unannounced in retaliation for Nicholson's complaint.  Finally, as noted above, Nicholson has put forth evidence that—if believed—tends to undermine Petco's legitimate reason for the alleged demotion.  Taken together, this evidence is sufficient to raise an inference that retaliation was the likely reason for the adverse action.

We need not repeat our analysis for the second and third steps of the McDonnell Douglas framework for Nicholson's retaliation claim.  Petco's legitimate, nondiscriminatory (and nonretaliatory) reason for its alleged adverse action naturally remains unchanged from the discrimination claim.  So does the discussion regarding whether Nicholson can show pretext by demonstrably undercutting

---

[6] We reject Nicholson's contention that the temporal proximity is much closer because he engaged in two protected activities: reporting the "old dog" comment in July 2016 and reporting McVey's ageist conduct to Kaswell in late September 2016.  Nicholson provides no evidence whatsoever that McVey knew about Nicholson's late September phone call with Kaswell or any of its contents.  Logic dictates that a plaintiff alleging retaliation cannot show a causal connection "without some evidence that the individual[] responsible for the adverse action knew of the plaintiff's protected conduct at the time [the individual] acted."  Daniels, 776 F.3d at 196-97 (citations omitted).

Petco's proffered legitimate reason.  Consequently, we will deny Petco's motion for summary judgment on Nicholson's ADEA retaliation claim.[7]

IV.    **Conclusion**

Nicholson's claims of age discrimination and retaliation withstand Rule 56 scrutiny.  We will therefore deny Petco's motion (Doc. 22) for summary judgment. An appropriate order shall issue.

/S/ CHRISTOPHER C. CONNER

Christopher C. Conner, Chief Judge
United States District Court
Middle District of Pennsylvania

Dated:    September 6, 2019

---

[7] We note that, although Nicholson's claims for discrimination and retaliation under the ADEA both require "but-for" causation, there may be more than one "but-for" cause of a single adverse employment action.  See Bellissimo v. Westinghouse Elec. Corp., 764 F.2d 175, 179 n.1 (3d Cir. 1985), abrogated on other grounds, Price Waterhouse v. Hopkins, 490 U.S. 228 (1989); Malin v. Hospira, Inc., 762 F.3d 552, 562 n.3 (7th Cir. 2014) (assuming FMLA retaliation requires but-for causation and permitting claims of retaliation under FMLA and Title VII to go to jury despite existence of only one adverse employment decision); Briggs v. Temple Univ., 339 F. Supp. 3d 466, 500-02 & n.8 (E.D. Pa. 2018) (finding jury verdict in plaintiff's favor on ADEA discrimination and retaliation claims for same underlying adverse action not internally inconsistent).  The "but-for causation" standard does not require discrimination or retaliation to be *the sole* cause, only a necessary one.  A jury, therefore, reasonably could find in Nicholson's favor on both claims without being irreconcilably inconsistent.